No. 13,614.

LEWIS ET AL. *v.* THE PEOPLE.
(60 P. [2d] 1089)

Decided June 29, 1936. Rehearing denied September 28, 1936.

Mr. A. W. McHendrie, Mr. Horace N. Hawkins, for plaintiffs in error.

Mr. Paul P. Prosser, Attorney General, Mr. Byron G. Rogers, Attorney General, Mr. Charles H. Queary, Assistant, Mr. Walter F. Scherer, Assistant, Mr. French L. Taylor, District Attorney, for the people.

*En Banc.*

Mr. Justice Young delivered the opinion of the court.

Plaintiffs in error, Thomas L. Lewis, Miles G. Saunders and Ethel L. Westcott, named as defendants in a criminal information filed in the district court of Pueblo county, were charged with the embezzlement of $15,329.21 of the personal property, goods, chattels and monies of the Railway Savings and Building Association, a corporation. A change of venue was granted and the case was tried in Kiowa county. We will herein refer to them as defendants.

The defendants were convicted of the crime charged and on this review assign numerous errors upon which they rely for a reversal of the adverse judgment of the district court.

The record in the case is voluminous, consisting of twenty-seven volumes and the abstract fills more than a thousand pages, but in all the evidence introduced there is little, if any, conflict. The errors assigned are based on the alleged insufficiency of the evidence to establish the crime charged; the admission of evidence alleged to be incompetent, over objection; the giving of instructions which, defendants say, were erroneous; refusal of the court to give tendered instructions; and its failure to inquire of the jurors, when the verdict was read purport-

ing to be signed by their foreman and to be their verdict, whether it was in fact their verdict. The evidence, which necessarily must be stated in some detail, was to the following effect:

The Railway Savings and Building Association was incorporated in 1902, and continued as a going concern until a receiver was appointed to take charge of its business July 6, 1932. From its organization until 1909, one Parker was the secretary and manager. The defendant Lewis was employed as bookkeeper and manager to succeed Parker, was elected a member of the board of directors in January, 1910, and continued on the board until the receivership. He served as secretary until 1925 and as manager until the receivership. During the time Parker was manager of the association he received as such officer a commission on all stock sold by the association. Out of this commission he paid his subagents.

The by-law with reference to the duties of manager and in effect during the period of time covered by the evidence, is as follows: ''Manager: The Manager shall have full charge of the sale of stock; also of all agents' accounts, making such terms therewith as may be deemed to the best interests of the Association. He shall perform such other duties as may be imposed upon him by the board of directors.''

The commissions on the sale of stock at first were $1.50 a share as disclosed by the minutes of the company. Later they were raised to $2, and then reduced to $1.50, and though no minute to that effect appears, the defendants testified that in 1916, by action of the board, commissions on the sale of stock were again raised to $2. This testimony is corroborated by that of H. E. Clucas, a witness for the prosecution, and a member of the board from 1905 until the receivership, who testified that he sold stock for the company during all that period of time, that for at least fifteen years he had drawn a commission of two dollars a share, and that during that period of time he had sold hundreds of shares. That such action was taken fur-

ther appears by a resolution passed by the board and under which one Homer J. Kendall was employed as general agent. Reference is made to this resolution as the Kendall resolution and it was entered on the minutes of a directors' meeting September 8, 1916. One paragraph reserved to the individual members of the board of directors a full two per cent commission on any shares that such board members might sell, the paragraph being as follows: "Provided that said terms [referring to the terms stated in the contract] shall not apply to any stock sold or subscriptions obtained personally by individual members of the Board of Directors, but that in such cases said two per cent shall be allowed and paid to the individual director selling the stock or obtaining the subscription."

People's witness Counts, an expert accountant, testified that from his inspection of the books of the association the charge of two dollars per share first began to be reflected in the books after July 5, 1916. He further testified that the two dollars appeared on the books as a capital deduction, and that it also appeared from the books of the company that the first manager, Parker, and his successor, Lewis, had drawn what are described as overriding commissions, being the full commission authorized less such commission as was paid to the subagent selling the stock, from the inception of the company. At a directors' meeting on January 28, 1905, the minutes, among other things, show the following: "On motion of G. M. N. Parker, the sum of $2 per share was allowed him for the use of selling stock, which commission shall be paid in lieu of an expense account." At that time Parker was the secretary and manager of the association. It further appears from the testimony of the people's witness Counts that the fact that Lewis was receiving commissions on the sale of stock appears on the books as kept by the company in seven different places.

The people introduced the testimony of various employees in the office of the company who also were stock-

holders in the association to the effect that they had no knowledge that Lewis was drawing overriding commissions; but the evidence is clear that Clara Pearson, who testified for the people, had figured these commissions, that a number of other employees had been shown how to figure them and that at various times they had computed the amount of commissions and overriding commissions payable to the defendant Lewis.

In the early history of the association and until 1912 Samuel D. Trimble served as its attorney and was paid a fee for the examination of abstracts. Under the rules of the association a prospective borrower was required to pay a fee of $10 for examination of abstract and appraisal, which fee was later raised to $15. When an abstract was received by the association if the $10 was paid by the applicant for the loan, it was enclosed with the abstract and sent to the attorney as his fee for the examination. If it was not sent in by the applicant a slip was placed in the cash drawer, and $10 taken out, pinned to the abstract, and sent to the attorney for the examination. When the loan was completed the $10 taken from the cash drawer was replaced and charged against the amount of the loan. No record ever was made on the books of the company showing the $10 and later $15 item paid for abstract examination to be income of the company. The defendant's witness, Purcell, an expert accountant, testified that he was familiar with the practice of fourteen Colorado associations; that thirteen of them handled the abstract fees in this manner; and that the fourteenth kept an account of the fees because two attorneys were employed, but that such fees were not considered as income of the association. This same practice with reference to these attorney fees was followed after defendant Saunders became attorney for the company, succeeding Samuel D. Trimble in 1912, and until the association went into the hands of a receiver.

The resolution employing defendant Saunders as attorney in 1912 provided that he should receive as com-

pensation the abstract fees and such foreclosure fees as might be allowed by the court.

Defendant Saunders was elected a member by the board in 1923. In 1925 by a resolution of the board, on which Saunders did not vote, the board accepted a proposition from him to represent the association generally in taking over the work of looking after taxes, special assessments and the collection of delinquent payments on stock subscriptions, for one per cent on all real estate loans made, from and after January 1, 1925. It further was provided that under this agreement defendant Saunders would look after all loans made prior to January 1, 1925, rendering the service without additional compensation. After assuming these duties in March or April of 1926 Saunders, who theretofore had maintained a private office for the practice of law, which for a period of fifteen years he testified had paid him from $15,000 to $30,000 per year, gave up his private practice, moved into the office of the association and devoted all of his time to the affairs of the company. From the time this 1925 resolution was passed, defendant Saunders was paid the one per cent commission on loans up to February, 1929.

In 1917 Walter A. Saunders, not related to defendant Saunders, was elected a member of the board of directors and continued in that position until his death April 7, 1928. Walter Saunders was a business man of wide experience, and November 10, 1925, was employed to take active charge of the real estate loan department of the association. There appears in the minutes of that date a notation that his salary was fixed at $300 per month. It appears in evidence that from the date of his election in 1909, Lewis, as manager, had drawn commissions and overriding commissions on all stock sold other than by directors and by special agent Kendall, and that as an inducement to Walter Saunders to undertake the management of the loan department, Lewis agreed to give him thirty per cent of the overriding commissions, such as he had been receiving monthly by check of the association

during all the years that he had served as manager; Saunders accepted the proposition and such division was made until the death of Walter A. Saunders on the date above stated.

Purcell, who was employed as auditor of the association, and who prior thereto had been doing general public accounting, on October 1, 1928, made an audit of the books of the association for the year 1925, and a second audit for the year 1926. Purcell was suggested by the then Building and Loan Department of the state as an accountant familiar with building and loan association matters, and it was understood that a copy of his report should be furnished to the state department. Purcell testified that in making the audits he learned of the commissions received by Lewis, also of the division with Walter Saunders, and later of the twenty per cent of such commissions paid by Lewis to defendant Westcott. That he discussed the manner in which such commissions were paid with the Building and Loan Commissioner and that no objection was made by the department at that time as to the manner in which the association was conducting its business.

The defendant Westcott entered the employ of the association as a stenographer in 1908. In March, 1925, she was elected secretary, and on the death of Walter A. Saunders in 1928, was elected to the board. She held her position until the appointment of the receiver. In 1927 she was receiving a salary of $3,000. She testified that at that time she became dissatisfied with her position, that her compensation was inadequate for the large amount of work that she was doing and she told Mr. Lewis that she was going to leave unless she could get more money—that she felt she was worth more to the association. In order to retain her services Lewis agreed to pay her twenty per cent of his commissions and did pay her that percentage in cash until the death of Walter Saunders, after which her work being increased he paid her thirty per cent of the commissions, the amount theretofore re-

ceived by Walter Saunders. This division continued until 1929.

From and after February 1, 1923, all of the directors received a director's fee of $100 a month authorized by a resolution of the board, as shown by the minutes of the meeting of January 13, 1923, and in addition thereto Lewis and Westcott each drew a salary of $5,000. The salary of Lewis was authorized by resolution of the board appearing in the minutes dated March 10, 1925, to be paid' from and after January 1, 1925, and that of Westcott by resolution of date February 17, 1928, to be paid from and after February 1, 1928.

Miss Westcott testified that in a meeting of the board held in November, 1928, Mr. Bristol, also a member of the board, suggested that inasmuch as Miss Westcott and Lewis were each receiving a salary of $5,000 he thought Mr. Saunders was entitled to the same salary. It was agreed that he be paid a salary of $5,000 beginning the first of January, 1929, and he was paid that salary prior to the alleged agreement upon which the charge of embezzlement was based, for January and February of 1929. No mention of this act of the board appears in the minutes of the board meeting. In February, 1929, it appears that the three defendants, on the suggestion of Mr. Lewis, agreed to relinquish their salaries of $5,000 each, that Saunders would relinquish his one per cent on loans under his contract with the board of directors in 1925, and that Lewis would divide the commissions that he had theretofore received equally with Saunders and Westcott in lieu of any other compensation other than the directors' fees, Saunders still to receive his abstract and foreclosure fees. The three defendants testified that when this arrangement was entered into Miss Westcott stated that being an unmarried woman it was embarrassing to her to receive payments either by check or cash from Mr. Lewis and she asked Mr. Purcell, the auditor, how it might be handled. He suggested that a special account be set up solely for the purpose of paying these commissions; accord-

ingly, a special account was opened with the First National Bank in Pueblo and when the commissions were figured at the end of the month instead of a check being made to Lewis, or Lewis agent, as had theretofore been the custom, a check was drawn on the regular account of the association for the amount of this commission payable to the special account of the association and deposited in the First National Bank. This bank was instructed not to render statements or to turn over the cancelled vouchers to anyone other than Miss Westcott or Mr. Lewis. This action together with other facts and circumstances is relied upon by the people as showing secrecy in the taking of the commissions, including the commissions charged to have been embezzled. Both Lewis and Saunders testified that it was immaterial to them whether the commissions were paid through this special account or directly to Mr. Lewis as they had been paid since he was elected manager in 1909. Purcell corroborated the testimony of the three defendants as to the manner in which this account was opened. All of the defendants testified that it was opened solely on the request of Miss Westcott and that it was not done with any idea of taking secretly the commissions that theretofore had been taken openly by Mr. Lewis for a period of twenty years. At the time this agreement for a three way division of the commissions was made, Mr. Saunders still was receiving the abstract fees. Some time after the agreement he suggested that he thought if Lewis divided his commissions that he should divide his abstract fees in the same way, and so, from and after this time, instead of the fees for the examination being paid to Saunders directly, they were turned over to Miss Westcott who kept an account of them in a private record and they were divided as were the commissions at the end of each month. The private record of these commissions was in the custody of Saunders and was produced by defendants at the trial.

The effect of the depression being felt in 1931, no commissions were paid after August of that year, but the em-

ployees continued to figure them and they were credited to Lewis on the books of the company as theretofore.

With these facts as a background, the commissions accruing on the sale of stock during the month of January, 1931, amounting to $15,329.21, were paid into the special account in the First National Bank, and February 25, 1931, were paid to the defendants by three equal checks drawn on that special account. The money represented by these three checks is the money charged as having been embezzled by the three defendants.

Considerable evidence, practically none of which was denied, was admitted over the objection that it was irrelevant, incompetent and immaterial to the issues. Some of that evidence appears in the general background just set up; other parts of it will appear as the objections to its admission are hereafter given consideration.

The people's theory of the case, as set forth in their brief, is variously expressed as follows: "It is the theory of the people that the defendants in the month of February, 1929, being the principal officers of the Association composing a majority of the Board of Directors and in complete control of the affairs of the Association, agreed and conspired together to cease drawing the salaries and remuneration they were receiving for their services, by authority of resolutions contained in the minutes of the Association, and take and divide between themselves, both direct and overriding commissions on the sale of stock of the Association (which stock was sold with each loan made), which commissions the defendant Lewis had been unlawfully taking since his connection with the Association from 1909, and the taking and dividing between themselves, moneys paid to the Association by applicants for loans and known as 'abstract attorney fees,' which moneys the defendant Saunders had been taking unlawfully since the month of January, 1925; and that in pursuance of said conspiracy and agreement, the defendants took the $15,329.21 in the month of February, 1931, which is the basis of the present charge of embezzlement.

"The charge upon which the State's case was tried was that the defendants, officers and directors of the Railway Savings & Building Association, a building and loan corporation located at Pueblo, Colorado, on February 25, 1931, unlawfully, feloniously and fraudulently, embezzled the sum of $15,392.21, which sum was the property of the Railway Savings and Building Association, and in the possession and control of said defendants, and that the defendants embezzled said sum by secretly taking and receiving said moneys through *unauthorized* commissions on the sale of stock."

"The theory of the State's case as to the *unlawful taking* of the sum mentioned in the information, was that said sum was taken as *purported commissions,* and that nowhere in the printed or written records of the Association does there appear a *resolution,* contract, or authority of any nature, authorizing the defendants, or either of them, to take the said moneys as commissions, salaries, or under any other guise." (Italics ours.)

An analysis of the people's theory of the case, and a statement of the manner of taking the moneys charged to have been embezzled, will disclose a few simple issues which are buried under the mass of testimony.

For two decades Lewis as manager of the association had taken the full authorized commissions on the sale of all stock, not sold by directors, and a commission on the stock sold by subagents equal to the difference between the full commission allowed the directors and the amount paid the subagents, such differential being known as an overriding commission. The people proved this beyond a question and the defendants in their turn introduced more testimony to the same effect. Under the people's version of the evidence the defendants agreed to waive their authorized compensation as shown by resolutions incorporated in the minutes of the company and take in lieu thereof unauthorized commissions. Under defendants' version they merely divided commissions that Lewis had a right to take or which they in good faith believed he had

a right to take. Under the people's theory there are but two issues in the case: One of law for the court, to be determined before submitting the case, and one of fact for the jury: 1. Did the defendants have a right to such commissions (question of law under the evidence)? 2. If they had no right to commissions did they in good faith believe that they had a right to them (question of fact for the jury)? Under the defendants' theory there are four issues not greatly dissimilar: 1. Did Lewis have a right to the commission (question of law under the evidence)? 2. Did defendants in good faith believe he had such a right (question of fact for the jury)? 3. Did defendants fix their compensation to be paid by the Association (question of fact for the jury)? or 4. Did defendants merely divide Lewis' commission (question of fact for the jury)?

We may at the outset eliminate a consideration of the abstract fees and their division for they were authorized by the board to be paid to Saunders for legal services long before he was a member of the board. Under the evidence here these fees did not constitute income of the association, and Saunders could agree to divide them, and divide them with whomsoever and in any way he saw fit and the division would not constitute a crime.

▆▆▆▆ The district attorney tried the case on the theory that neither the three defendants nor Lewis alone were entitled to such commissions. If they were entitled to them they were not guilty of a conversion of money of the association in taking that to which they were lawfully entitled. If Lewis was entitled to them or they so believed and merely divided them, there was no conversion. A conversion of the money of another is not in and of itself an embezzlement, but it is an indispensable element of an embezzlement. In submitting the case to the jury the trial court necessarily determined that neither Lewis nor his codefendants were as a matter of law entitled to the commissions, otherwise there was no conversion. The defendants raised this issue by a motion for a directed verdict and requests for an instructed verdict

of not guilty as to each of them. The state contended that
no lawful action had been taken authorizing commissions
to Lewis or to the other defendants and in support of this
contention introduced the minutes in which there is no
record of such action; also testimony of witnesses was in-
troduced that they had no knowledge of any such action
being taken. It was further shown that Lewis' salary was
fixed as disclosed by the minutes and no reference made
to commissions. The defendants were the officers of the
corporation and in the usual and ordinary management
of its affairs charged with the duty of keeping the min-
utes. Their failure to include such matters, involving huge
sums of money, in the minutes, is a strong circumstance
that action was not taken or if taken that it was inten-
tionally omitted from the minutes.

The manager is an officer under the by-laws.
Lewis, by virtue of this office claimed the commissions
which he took for over two decades, and which his prede-
cessor Parker likewise had taken under a resolution allow-
ing him $2 per share in lieu of an expense account. The
section in the by-laws with respect to the duty of the
manager is as follows: "Manager: The Manager shall
have full charge of the sale of stock; also of all agents,
making such terms therewith as may be deemed to the
best interest of the Association. He shall also perform
such other duties as may be imposed upon him by the
Board of Directors." This section gives him full charge
of the sale of stock and of the making of contracts with
agents, but it does not by any reasonable construction fix
his compensation, by commission or otherwise, for per-
forming the duties of his office. This by-law was amended
in 1930 but while the wording is slightly changed it re-
mains in substantial effect the same. As amended it reads
as follows: "Manager: The Manager shall have full
charge of the sale of stock; also of all agents' accounts,
making such terms therewith as may be deemed to the
best interests of the Association. He shall perform such

other duties as may be imposed upon him by the board of directors.''

We think there was sufficient evidence of conversion—one of the necessary elements of embezzlement—to carry the case to the jury on that matter. It then remains to be determined whether there was evidence of criminal intent in making the conversion.

██ ██ The court instructed the jury as to intent in instructions 5 and 6. Instruction 5 is as follows: ''Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused.'' Instruction 6 reads: ''The law infers that everyone intends the necessary consequences of his acts and is presumed to intend what he voluntarily does. And you are further instructed that intention is a question for the jury to determine from all the facts and circumstances disclosed from the evidence in the case.''

In taking commissions as compensation for themselves or in dividing those of the manager, if not lawfully authorized, the manager and his codefendants were guilty of a conversion that imposed on them a civil liability. They are held to intend the necessary consequences of a voluntary taking of commissions not lawfully authorized as compensation. Such a voluntary taking, amounting to a conversion, does not carry with it necessarily an inference of criminal intent, which is essential to constitute an embezzlement. Intent, in the language of the instruction, is ''manifested by the circumstances connected with the perpetration of the offense,'' and from such circumstances and the testimony of the accused if they testify to their intent, and they did in this case, the existence or nonexistence of criminal intent is to be determined. Defendants assert that they in good faith believed that Lewis had a right to the commissions. If they did so believe it is not material whether their belief was well founded or not. An analogy is suggested in the law of self-defense in murder cases where one is justified in acting on ap-

pearances within certain well recognized rules. ''An exception to the general rule exists where a specific intent is essential to a crime, and ignorance of law negatives the existence of such intent, as where a person charged with larceny or robbery believed the property to be his own.'' 16 C. J. 85; ''Ignorance of the law cannot excuse any person; but, at the same time, when the question is, with what intent a person takes, we cannot help looking into their state of mind; as, if a person take what he believes to be his own, it is impossible to say that he is guilty of felony. Reg. v. Reed, C. & M. 306, 307, 41 ECL 170 (per Coleridge, J.)'' 16 C. J. 85, foot note 99, §2. Ignorance of the law, of course, does not excuse its violation, as if one should take property knowing it belonged to another, but not knowing that larceny was a crime. But if one takes property of another believing it to be his own, he is not guilty of larceny because his action is predicated on a mistake— not a mistake as to the existence or the effect of the law against stealing, but as to the ownership of the property which negatives the specific intent to do what the law inhibits, namely, the taking of another's property with a present consciousness of his property right therein. Similarly, the conversion of the money of another in one's custody in ignorance that there was a law against embezzlement would be no defense, but if one believed he had a right to a part of such money as compensation and so converted it, he would not be guilty of embezzlement because his action is predicated on a mistake—not a mistake as to the existence or effect of the law against embezzlement, but as to his right in the thing taken, which negatives the specific intent to do what the law inhibits, namely, the taking of the property of another with a present consciousness of his property right therein.

In *White v. People,* 76 Colo. 208, 230 Pac. 614, we said: ''Defendant testified in his own behalf and asserted the good faith of the claim under which he had retained the funds in question. There was also evidence that he had consulted with the district attorney, the county attorney,

private counsel and the state auditor, and had been advised by each that his position was correct. * * *

"An unlawful and unexplained conversion will support an inference of felonious intent, but an unlawful conversion alone is never conclusive as against the defense of good faith, supported by evidence of an honest claim of right."

Intent is manifested by circumstances and must be proved by the state by circumstantial evidence. Circumstantial evidence, to authorize a finding of criminal intent, must be consistent with such intent and inconsistent with any reasonable hypothesis of its absence. The fact that there was evidence of conversion; that one of the defendants was a lawyer of wide experience and ability; that the other defendants had long been connected with the association; that they were intelligent and of more than average ability; that the compensation taken as commissions was a vast amount, such as might well excite inquiry as to the lawful right to take it; that they returned to the association in excess of $816,000 as commissions taken when their right to them was questioned—these and other circumstances in the record were proper for the consideration of the jury. Some may be consistent with a criminal intent; some may be consistent with its absence. Whether or not such circumstances as a composite whole were consistent with a criminal intent and inconsistent with any reasonable hypothesis of its absence is a matter for the jury.

We think, therefore, that it was not error for the court to deny the defendants' motion for an instructed verdict of not guilty and to refuse the defendants' individually requested instructions for a verdict of acquittal.

It remains to determine whether errors were committed on the trial.

Over objection of the defendants the people were permitted to prove certain acts and transactions subsequent to the charged embezzlements. The people's witness, Clara Pearson, testified that prior to February,

1932, she had no knowledge of the existence of the special account in the First National Bank, but that beginning the first part of 1932 she had charge of the handling of that account, and that she was directed to issue checks to Saunders on the account monthly on the basis of $25,000 a year, to Lewis monthly on the basis of $15,000 yearly and to Miss Westcott monthly on the basis of $15,000 yearly. Four of such monthly checks were issued to Westcott and Lewis each and five to Saunders. The court stated to the jury that such evidence was admitted only for the purpose of showing plan, scheme and intent. The moneys for payment of these salaries were placed in the special account at the First National Bank from February, 1932, down to the time the receiver was appointed, and the amounts so placed in the special account were charged to the "agents' commission account" under the direction of Miss Westcott. While objecting to the admission of this evidence of the payment of such salaries, the defendants testified that the reason for the cessation of drawing commissions was discussed at a directors' meeting in December, 1931, and the salaries agreed upon in the board meeting, though no minute was made of the agreement. Defendant Saunders assumed the responsibility for the absence of a minute, testifying that inasmuch as these salaries were payable out of commissions and charged to commissions the agreement did not impose any additional burden, but rather lightened the burden upon the association. We have held that under certain conditions, evidence of both prior and subsequent similar offenses and conduct may be admissible to prove plan, scheme or intent. The plan or scheme of the taking was clearly manifested in the bookkeeping set-up shown by the direct testimony of the state's witnesses. From this testimony there was no possibility of any dispute or issue as to the plan or scheme of taking. When the checks were cashed by the defendants the embezzlement if such it was, was completed. In their brief the people say: "The People proceeded upon the theory throughout the trial

of this case that the three defendants, Saunders, Lewis and Westcott entered into an agreement or conspiracy in January, 1929, to unlawfully take moneys from the Association, by taking commissions on the sale of stock *in lieu of the salaries and remunerations they had been receiving under authority of resolutions on the minute books of the Association.*" (Italics ours.) The unlawful act of which the people complain had its inception in the agreement to take the commissions and was fully carried out when the checks were cashed. We fail to see in these circumstances, where the taking of salaries payable out of commissions a year later throws or could throw any light on the scheme or plan fully carried out by the defendants a year before.

It remains to determine whether the fixing and taking of such salaries indicates a criminal intent in the taking of the monies charged to have been embezzled. The defendants testify they were authorized by the board. They may or may not have been so authorized. The defendants may have believed they had a right to the commissions which they took in 1931; they may not have believed that they had a right to fix salaries payable out of commissions; or they may not have believed they had any right to the commissions when taken; but they may have believed that they had a right to fix and take salaries payable out of commissions. The fixing and taking of these salaries involves the factor of alleged board action which is an entirely different plan from that of the mere taking and dividing of commissions. Furthermore, they were paid by checks on the special account which were not written by any of the three defendants, but by Clara Pearson in the regular course of payment of salaries, and the amounts appeared as salaries paid on the books of the company.

Over the objection of the defendants one of the witnesses for the people was permitted to testify that when she first was employed by the association she was told that she was not to become familiar with other em-

ployees of the association. The district attorney in offering this, in answer to an objection, stated that he was trying to show the attitude of those concerned and the internal workings of the association. We fail to see where this matter was in any way material in throwing any light on the question of whether the crime charged had or had not been committed. In the light of other and more vital errors we need not determine whether the admission of this evidence was or was not prejudicial, but being immaterial it should have been excluded.

The people on cross-examination of Lewis and Miles Saunders proved that C. H. Bristol, who was elected to the board January, 1909, and who served as a board member continuously until the association was placed in the hands of receivers, was in 1923 voted a salary of $250 per month, and that from this date he received that salary plus $100 a month as director's fee, until 1925, when his salary was raised to $10,000 a year plus director's fee. The people were permitted further, over objection, on such cross-examination of Saunders, to prove that prior to 1925 Bristol did no work in the office but was a division superintendent of the Santa Fe Railroad Company for Colorado and New Mexico and gave the principal part of his time and attention to that work; that when he was voted the salary of $10,000 he was a resident of California and did nothing other than attend directors' meetings. Mr. Saunders explained this salary as having been voted by the board in large measure because of the services that had been rendered by Bristol during the infancy of the association at which time he had been largely responsible for its establishment and placing it on its feet. Over objection the defendant Saunders was further cross-examined as to whether he made any effort to advise the stockholders of the $10,000 salary drawn by Mr. Bristol and he explained that the matter theretofore had been called to the attention of the stockholders in regular meeting and referred back to the directors in the meeting of March 10, 1925, by the following resolution: ''Therefore,

be it resolved that the matter of adjusting with Mr. Bristol the amount owing him for past services, as well as fair future compensation, and also the salary to be paid to Mr. Lewis in the future, be referred to the Board of Directors of the association." Other witnesses also were examined as to what Bristol had done to earn the salary that was voted to him.

Pursuant to the foregoing resolution of the stockholders a resolution of the board of directors was offered by H. E. Clucas, one of the state's witnesses and a member of the board, which resolution was as follows: "Whereas the Stockholders of this Association in annual meeting adopted a resolution directing the Board of Directors to take proper action fixing a salary for C. H. Bristol in remuneration of services heretofore rendered as well as compensation for future services, and

"Whereas, it appears that Mr. Bristol has served the Association as its President during the past twenty-one years and the stockholders have declared that upon his election in the first instance as well as upon subsequent occasions fair compensation was promised Mr. Bristol but the fixing and payment of the amount thereof has been delayed, and

"Whereas, through the activity and ability of Mr. Bristol this Association has thrived and prospered until it now has outstanding loans in excess of three million dollars and the duties and responsibilities of the officers of the Association have likewise increased and become more burdensome, and

"Whereas, it is the belief of this Board that fair and adequate compensation should be paid to its executive officers for their services.

"Therefore, Be It Resolved in furtherance of said Resolution so adopted by said Stockholders and in compliance therewith, the salary of Mr. Bristol is hereby fixed at $10,000 per year, payable in monthly installments beginning January 1st, 1925, it being intended hereby that

such payments shall be compensation for future services as well as for services heretofore rendered.''

It thus appears that Bristol's salary was fixed by a resolution of the board, while it is claimed by the state that the commissions were not fixed by resolution of the board or authorized in any manner.

We think that with no more evidence than is disclosed by the record, the testimony with reference to what Bristol did to earn his salary fixed first at $3,000 and in 1925 at $10,000, while he was a resident of California, which was objected to, should have been excluded. What already has been said with reference to the salaries fixed subsequent to the charged offense throwing no light on the question of plan or design applies with equal force to the testimony of what Bristol did to earn his salary. It does not appear in the record that Bristol had ever objected in any way to the payment of commissions to Parker, Lewis or Westcott and to Walter Saunders, or that he would have done so if not drawing a salary. He was on the board during all the time that such commissions were paid. Before the fixing and the payment of his salary and what he did to earn it could have any possible bearing on the question of the intent with which the funds charged as embezzled were taken, it would be necessary to assume three things: 1. That the board knew that it had no right to fix such a salary for Bristol; 2. That Bristol knew that he had no right to receive it; and 3. That so knowing, Bristol for this reason did not object to the continued taking of a $2 commission by Lewis or to the three way division of it as shown by the record. When so many assumptions are required, the falsity of any one of which would negative the effect of the action as evidence of bad faith and when the ''milking process'' (so denominated by the people), in this instance is so remote in time and so dissimilar to the instance charged as an offense in that it appears fully in the records, we think the evidence was clearly inadmissible and undoubtedly prejudicial. It would appear that when defendants are charged with a

crime resulting in a pecuniary gain to themselves that a crime, or falling short of a crime, a breach of trust, resulting in a pecuniary gain to another would not be admissible as a similar offense on the question of intent unless there were some evidence, direct or circumstantial, that the one so benefiting by reason of the benefits received had connived in the accomplishment of the offense charged.

Over objection of the defendants, Counts, an expert accountant, who testified for the people, was permitted to state, as the court indicated, for "the purpose of showing the operation, plan, scheme, purpose and intent and for that reason only," that Saunders received $23,329.79 in excess of the amount which was due him under his contract with the association. The witness Counts testified, before he stated that the above amount in excess of that to which he was entitled had been taken by Saunders, that he arrived at it by ascertaining the amount of the foreclosure fees between February, 1929, and January 21, 1931, the total amount of which between those two dates was $24,639.26, adding to this $2,400, the amount of director's fees for the two years and the amount of Saunders' attorney fees of one per cent of the loans according to his contract, which three amounts totaled $96,597.96, and subtracting this from the amount paid him for compensation during that period which was $119,927.75. The difference between these two amounts was $23,329.79, which the witness testified was received by Saunders in excess of the amount due him under his contract with the association. Objection was made on the special ground that this was only a partial statement of an account and that a full account on foreclosure fees could only be had by ascertaining the amount of such fees and the amount paid to Saunders back to January 1, 1925, the date of his contract with the association. The court refused to strike this testimony upon the specific objection, and stated that the matter might be covered by the defendants on cross-ex-

amination of the witness. After an extensive cross-examination and stipulations as to certain foreclosure records, which were brought in, it was clearly shown that a complete account had not been stated and the witness Counts admitted that if he were asked to state that account he would have to make further investigation than he had made of each of the items contained in the foreclosure records. Again the defendants moved that this testimony be stricken which motion was denied. In the absence of such a complete accounting we think it clearly was prejudicial error to refuse to strike the testimony of the witness, based on a partial accounting, that the defendant Saunders had received during two years $23,329.79 in excess of what was due him under his contract. It will be recalled that when this testimony was introduced on the pepole's case in chief Saunders had not set up any claim that he was entitled to the money charged as embezzled other than as a part of commissions on the sale of stock, nor did he ever do so. If the wrongful taking had its inception in the agreement to take commissions and its consummation in taking them, as the people contend, the fact that other money was lawfully due Saunders would not make the taking lawful. That there was due a bank clerk on the last day of the month a salary of $150 which he was to be paid the following day, would scarcely authorize him in abstracting a $100 bill from the funds of the bank at the close of the day and if he did so, the fact that the bank owed him certainly would be no more than a matter of defense which should not be anticipated in the state's case in chief. A partial accounting could not establish whether Saunders had or had not received too much, and to permit the statement to stand that he had wrongfully received so large an amount, admittedly based on an incomplete investigation, permitted the jury to consider on the question of "operation, scheme, purpose and intent" a mere charge of wrongdoing. The testimony of Counts himself proves that he had not investigated sufficiently to

state as a fact that the money received by Saunders was in excess of that which he was entitled to receive.

Defendants predicate error upon the admission of certain testimony on redirect examination of the people's witness, H. E. Clucas. Clucas had been a member of the board of directors for a period of practically twenty-five years prior to the receivership. He testified on direct examination that there was nothing in the reports to the board meetings showing the commissions paid; on cross-examination he testified that he signed the semiannual reports filed with the county clerk and recorder, but did not think that he had sworn to them. In these semiannual reports, copies of which were introduced as exhibits by the district attorney as a part of his case, it appeared that the amount of commissions paid was set forth and that Clucas had sworn to them. He further testified on cross-examination that he did not know what commissions were being paid agents and that he did not know the total— that it never was discussed with him. When confronted with these exhibits setting forth the total amount of commissions paid, he admitted his signature and on re-direct examination—over objection and in answer to the question as to what the circumstances were with reference to his signing these reports, stated that he never swore to the reports—that he simply went to the office; that Miss Westcott requested him to sign the statements; that he did sign them; that there was no notary there; and that he did not swear to them. The district attorney having presented the exhibits as a part of his case, they being copies of public records, the originals of which it appeared were sworn to by the witness Clucas, it was error to permit the district attorney, when Clucas was confronted with his own sworn statement, setting forth the amount of commissions paid, to impeach the records by his testimony that he knew nothing about the amount of the commissions, and that he had not in fact sworn to such statements. Such evidence offered on redirect examination should have been excluded.

As indicating secrecy, unlawfulness in taking, and a consciousness of the unlawfulness of the taking of the monies charged to have been embezzled, the people stressed the fact that numerous matters, such as the taking of commissions and overriding commissions by Lewis, the fixing of Saunders' salary of $5,000 and the payment thereof for two months, the agreement between the three defendants to fix their salaries, and for Saunders to relinquish his one per cent commission on loans under his contract of 1925, do not appear as authorized in the minutes kept of the directors' meetings. The defendants by their testimony point to the fact that the office building constructed to house the association and paid for was not mentioned in any minutes of the meetings recorded, although the same was authorized, contracts entered into, and the building paid for and occupied by the association for a number of years prior to the receivership. Assuming that all of this testimony under the theory on which the case was tried, was proper for the consideration of the jury, the jury should have been instructed concerning it. At the close of all of the evidence the defendants tendered the following instruction based on this evidence: "You are instructed that there is nothing essential to the validity of a resolution adopted or an order made by the Board of Directors of a corporation, that such resolution or order be entered in the minute book of the corporation. If an order or resolution was made or adopted by a Board of Directors at a meeting of such Board, which has been omitted from the minutes, if proved to have been made or adopted, it is as valid and effective as if entered in minutes." We think the following is a correct statement of the rule: "The minutes of corporation meetings and other like corporate records are only prima facie evidence of the proceedings, and parol testimony is admissible for the purpose of proving what actually occurred." 14 C. J. 377 §494. We do not cite other authorities for the people concede that "It is undoubtedly the law that parol testimony may be admitted

to supplement minutes of a directors' meeting." The refusing of this instruction raises a serious question. As we have before pointed out, this case apparently was tried on the theory that if action had been taken by the board fixing the compensation of the officers and a minute made of it, that such action would be valid and effective. In deciding that tendered instruction 20 was proper on this theory we are not determining the correctness of the theory under section 2793, Compiled Laws 1921, which is not called to our attention by the briefs of either party and apparently was not considered by the trial court, and for this reason we do not determine its effect. "It is the object and office of instructions to define for the jury, and to direct their attention to, the legal principles which apply to and govern the facts, proved or presumed, in the case; and hence the instructions, whether given by the court of its own motion or by request, should be full, clear and explicit, giving to the jury all the law so far as it relates to the issues proved or claimed to be proved, if such issues are sustained by any evidence or by any legitimate inference therefrom, and in such a manner that the jury may not be misled or fail to understand the real issues; * * *" 16 C. J. 963-4. "Statement of theories of parties.—Instructions should be applied to the respective theories contended for by the parties rather than stated in the form of general propositions * * *" Note 60 (a) 16 C. J. 1047. The court in refusing this instruction assigns the reason for so doing that it was covered by instructions as to intent and that the record testimony along this line was admitted for the purpose of showing intent only. The record does not disclose any such limitation. The instructions on intent were as follows: "Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused." "The law infers that everyone intends the necessary consequences of his acts and is presumed to intend what he voluntarily does.

"And you are further instructed that intention is a

question for the jury to determine from all the facts and circumstances disclosed from the evidence in the case.''

As we view the matter these two instructions on intent, while correct statements of the law, do not cover the matter included in the defendants' tendered instruction No. 20. The instructions given on intent advise the jury that intent is manifested by the circumstances connected with the perpetration of the offense. From the very nature of intent it can be known as a fact only by the perpetrator of the act. It must be proved, since the people cannot produce the defendant as a witness and if he testifies in his own behalf to the absence of a criminal intent the people are not bound by it, by circumstantial evidence. The defendants' tendered instruction No. 20 is consistent with instructions Nos. 4 and 5 as given. Tendered instruction No. 20 tells the jury the legal effect of one of the circumstances proper for their consideration in determining intent. It tells them the effect of action as taken by the board and no minute made of it. Testimony of such action was admitted by the court. In the absence of that instruction the jury may well have believed that if action was taken by the board and not recorded in the minutes, that it was of no effect because not so recorded, and that compensation taken pursuant to such action was ipso facto taken wrongfully. On the theory on which the case was tried, this evidence was very material on the question of whether or not there was a conversion in fact of the monies charged to have been embezzled. The people in their brief lay emphasis on the fact, ''That nowhere in the printed or written records of the association does there appear a resolution, contract or authority of any nature, authorizing the defendants, or either of them, to take the said moneys as commissions, salaries, or under any other guise.'' The people in their brief make the following further statements: ''The People did, however, strongly stress the fact, that nowhere in the minutes could be found authority for the defendants to take the money alleged to have been embezzled.

"The fact that all of the resolutions (if passed) authorizing the defendants to take the money did not appear in the minutes, was a proper question for the jury to consider on the question of the intent of the defendants."

The tendered instruction leaves it to the jury to determine whether such action in fact was taken and leaves it for their further determination, to decide whether if taken, the failure to record it was for purposes of concealment. The weight of such circumstances in determining intent would be materially different if the jury believed that the action was taken and that it was of no effect because not recorded in the minutes and ipso facto showed a conversion, from what it would be if they believed that the action in fact was taken and was as effective as if recorded in the minutes, but was inadvertently or carelessly omitted from the minutes. Having stressed the omission not only as evidence of intent but also as evidence of the unlawful conversion, it was vital that the jury be informed of the legal effect of taking action and making no minute of it. Tendered instruction No. 20 deals with the legal effect of circumstances, which, if and when determined as facts, were then proper for the jury to consider in determining the intent with which the act charged as criminal was committed and for this reason it should have been given even under the people's theory of the case.

Defendants assign as error the refusal of the court to give defendants' tendered instruction No. 17, which was as follows: "You are instructed that if you believe and find from the evidence that the defendant Thomas L. Lewis, prior to the time charged in the information, was informed and advised by an attorney for the Railway Savings and Building Association that such defendant had the legal right to take and receive commissions on the sales of stock made in the office of the association, and overriding commissions on stock sold by subagents, and that such defendant in good faith believed and relied upon such information and advice so given him

by said attorney of said association, and received the money charged in the information to have been embezzled, relying upon such information and advice of such attorney, then and in that event a verdict of not guilty should be returned as to said defendant Lewis.'' Defendant Lewis testified that in 1909 when Parker was considering resigning as manager he had written out his resignation and that Judge Trimble, who was the attorney for the association, was called to the office and that he urged him to stay with the company, asserting that he could make more money in later years and stating that if he would remain with the company he would be allowed commissions just as Mr. Parker had been receiving them. He further testified that Judge Trimble pointed out to him among other matters the minutes of the meeting of January 28, 1905, as follows: ''and on motion of G. M. N. Parker the sum of $2.00 per share was allowed him for the use of selling stock, which commission shall be used in lieu of an expense account.'' That he told him he would have a right to do the same thing as Mr. Parker, namely, take commissions and overriding commissions on the stock that was sold. He further testified that he relied on the statements of Judge Trimble and believed that he was entitled to do so. In the light of such testimony the defendant Lewis had a right to have the jury instructed on this theory of his defense which properly was presented by tendered instruction No. 17, and the refusal to give the instruction was error. Instruction No. 13 given by the court was in the following language: ''You are instructed that if you believe and find from the evidence that the defendant Thomas L. Lewis was induced by the attorney of the Railway Savings and Building Association, and Directors of said Association, in the year 1909, to become the Secretary and Manager of said Association, upon the assurance made by them that if he did accept said position he would be entitled to receive commissions on the sale of stock in said Association, when such sales were made in the office of said Association, and overriding

commissions on stock sold by subagents, and that he entered upon the duties of said offices, relying in good faith upon and believing said statements so made to him, and began to take and receive said commissions with the knowledge of the Directors of said Association, and without objection on their part, and continued to take said commissions from that time forward, to and including the month of February, 1931, with the knowledge of the Directors of said Association, and without any contrary direction or resolution of any Board of Directors, and that in the year 1929 he entered into an arrangement with his codefendants to divide with them said commissions, and that the three defendants, in February, 1931, took and received the moneys charged in the Information as having been embezzled, believing in good faith that the said Thomas L. Lewis was entitled to the same as commission on stock sales, then and in that event your verdict should be not guilty as to all of the defendants.''

Instruction No. 13 makes it a condition precedent to the acquittal of Thomas L. Lewis that his two co-defendants should in good faith believe that he was entitled to these commissions, while tendered instruction 17 relates solely to defendant Lewis and advises the jury that if Lewis relied on these statements that it was their duty to find him not guilty. If he so believed, a concurrence in such belief by his codefendants was not necessary. For this reason we think it was error not to advise the jury of the law on this theory of the defense applicable to the defendant Lewis alone.

The defendants strenuously object to the giving of court's instruction No. 15. It is a poor statement of the law and while possibly not misleading and certainly not open to all of the objections urged against it by the defendants, the principle sought to be announced can and in the event of another trial, should be more clearly stated.

Error is assigned on the failure of the court to inquire of the jury when a purported verdict purporting to be signed by its foreman was read, whether it was their ver-

dict. This assignment is strenuously argued, but we do not deem it necessary to determine whether such departure from the usual procedure was fatal or prejudicial under the record in this case, for other errors require a reversal and on a new trial, if one shall be had, there can be a compliance with the usual practice as a matter of course.

Judgment reversed.

MR. JUSTICE HILLIARD, MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND concur.

MR. CHIEF JUSTICE CAMPBELL, MR. JUSTICE BURKE and MR. JUSTICE BUTLER dissent.