### No. 15,004.

### NORTON *v.* THE PEOPLE.
(135 P. [2d] 239)

Decided February 15, 1943.  Rehearing denied March 29, 1943.

Mr. FELIX O'NEILL, Mr. ARTHUR R. MORRISON, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE GOUDY delivered the opinion of the court.

PLAINTIFF in error, defendant below was convicted in the district court of conspiracy to commit a felony, to wit, the crime of obtaining money by false pretenses. The pertinent parts of the indictment are:

"That on the twenty-second day of July, A. D. 1937, and thence continuously until the tenth day of July, A. D. 1939, * * * E. W. Tarrant and James H. Norton, did * * * conspire * * * to do an unlawful and felonious act, to-wit, a felony, to-wit, the crime of obtaining money by false pretenses, in that * * * Tarrant and * * * Norton, with intent to cheat and defraud Lucien E. Umbricht, did * * * represent to * * * Umbricht that * * * Tarrant and * * * Norton knew and had great power and influence with all of the then existing Civil Service Commissioners of the Civil Service Commission * * * of Denver; and that * * * Norton had entertained them socially; * * * that * * * Norton knew, was acquainted with, and had entertained socially, certain people who were influential with the then existing Civil Service Commission * * * of Denver, and that said people had power and influence over said Civil Service Commission and could, and would, influence them in the making of an appointment for the placing of * * * Umbricht's name in such a position on the eligible list of said Commission as would insure his appointment as a policeman in * * * Denver, all for the design and purpose of obtaining, and to obtain, for * * * Umbricht a position as probationary policeman, and subsequently policeman, in * * * Denver; and that * * * Norton did expend for said social entertainment the sum of two hundred dollars * * *, and that each and all of the said pretenses and representations were then and there made by * * * Tarrant and * * * Norton with the design and for the purpose of inducing * * * Umbricht to * * *

pay to * * * Tarrant and * * * Norton the sum of fifty dollars * * *; and that * * * Umbricht then and there believed the said false pretenses and representations so made to him by * * * Tarrant and * * * Norton, and relied thereon, and was deceived thereby, and was induced * * * to pay to * * * Tarrant and * * * Norton fifty dollars, and they * * *, by means of said false pretenses and representations so made as aforesaid, with intent to cheat and defraud * * * Umbricht, did then and there obtain fifty dollars * * * of * * * Umbricht;

"Whereas, in truth and in fact each and all of the said representations so made by * * * Tarrant and * * * Norton were false and were known by them to be false when they so made them, and they were made with the intent and for the purpose of inducing * * * Umbricht to * * * pay the aforesaid * * * money to * * * Tarrant and * * * Norton, for the purpose of defrauding * * * Umbricht; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the state of Colorado."

On a second count, for obtaining money by false pretenses, the jury acquitted the defendant. Tarrant was convicted on both counts.

The evidence, considered in the most favorable light against defendant, and in support of the conviction, shows: that Umbricht was ambitious to become a policeman in Denver, had taken a previous civil service examination and had passed, but felt that he had not been treated fairly in selections from the eligible list; that he met Tarrant some time after June, 1936, and talked with him about the examinations, and in 1937 told him that he was taking the police examination and hoped he would get the job. May 17, 1937, Umbricht took an examination, and afterwards Tarrant saw him several times and asked him if he knew where he stood; July 1, 1937, Umbricht received notice that he had passed and was sixteenth on the list, and about July 20, 1937, told Tarrant, who replied that that was good, and

said, "I will bring a man out that I think will help you get up there." July 22, 1937, Tarrant brought Norton out to the cafe of Umbricht's father, where Umbricht was employed, and introduced him, and told Umbricht that he believed Norton would help him get high in the examination. Tarrant said, "This is Mr. Norton. I believe this man helped you get up there." Umbricht said, "That is swell, I appreciate that." Tarrant said that Norton knew all the civil service commissioners and the city officials. Norton stated that he had been out to a big dinner at which Umbricht's name was mentioned, and that Umbricht had passed a good examination and was sixteenth on the list. Norton said, "You passed sixteenth. * * * The grades are close. You could have been sixteenth or twenty-sixth. You know, under the civil service rule they only have to take every third one. They could skip you if they want to." Tarrant said, "Well, Luke [Umbricht], it cost Mr. Norton $200 for that dinner. I think you ought to pay for it. Umbricht did not have the money. Tarrant said, "Why don't you pay $100 now and $100 after your appointment? Umbricht said, "That is all right." Norton sat at the same table but said nothing. Tarrant testified that he left Norton and Umbricht together, and when he returned he heard the following conversation: Umbricht: I don't expect to have anybody do anything for me for nothing. "I am perfectly willing to pay * * *. What is it worth?" Norton: "Well, I don't know. What do you say?" Umbricht: "Well, whatever you think is right." Norton: "Well, how would it be $50 now and $100 after you get an appointment?" Umbricht testified, "No, there was nothing said that I was positive of getting an appointment. He [Norton] just said I was sixteenth on the list, and he told me that under the civil service rule they only had to take one out of three. I was afraid if I didn't pay it they might skip me, I didn't know. I was too scared to ask any questions, and never asked any questions. * * * Q. So all that was said then, was that

Mr. Norton had been present at a dinner and that your name had been mentioned, and that you were sixteenth on the list? A. This is the way I remember. Q. This money was to go to Norton because he had given a dinner? A. That was my understanding."

Tarrant also testified that the thing that Norton was to do for Umbricht was to use his influence to get Umbricht on the police force. That night Umbricht gave Tarrant $50 and took a receipt, and thereafter Umbricht paid Tarrant various sums of money. Umbricht never talked to Norton after he was in the restaurant. Umbricht testified that he believed the representations made by either Tarrant or Norton, and relied thereon, and made the payments because he was afraid that they might skip him, or something. He had passed high on the list and wanted to be sure to get the position. He never saw Norton before or after the one meeting.

Tarrant testified that he gave the first $50 to Norton, and Norton gave half of it back to him. Tarrant gave none of the balance of the money to Norton. Norton denied receiving the $50, and the jury must have resolved this issue in his favor, as they acquitted him of obtaining money by false pretenses.

The indictment charged that Tarrant and Norton represented: (a) That they knew and had great power and influence with all the then existing civil service commissioners of Denver; (b) that Norton had entertained them socially; (c) that Norton knew, was acquainted with, and had entertained socially people who were influential with the Civil Service Commission of Denver, and that such people had power and influence over the civil service commissioners and could, and would, influence them in the placing of Umbricht's name in such a position on the eligible list of the commission as would insure his appointment as a policeman of Denver; (d) that Norton had expended $200 for said social entertainment.

The record contains no evidence supporting charges

(b.) and (c) above listed, and while it discloses that Norton knew the then existing civil service commissioners, it contains no other evidence supporting charge (a) above listed, and charges (a), (b) and (c) will not be noticed further.

■ The only remaining charge is (d), and the indictment is not clear to which previous charge this refers; if to charge (b), there is no evidence that Norton represented that he had entertained any of the civil service commissioners socially; if to charge (c), there is no evidence that Norton represented that he had entertained socially people who had power and influence with the civil service commissioners, and could, and would, influence them to place Umbricht's name in such a position on the list as would insure his appointment.

At best, the evidence shows that they falsely represented to Umbricht that Norton had been at a dinner at which Umbricht's name had been mentioned, that this dinner had cost Norton $200, and that Umbricht ought to reimburse him. This may have been a conspiracy upon which Norton could have been indicted, tried and convicted, but it is not the one charged in the indictment.

The rule is clear that, "on trial of an indictment for conspiracy, the proof must correspond with and support its material averments." 12 C.J., p. 626, §210.

In *Lefco v. United States,* 74 F. (2d) 66, the court said (p. 68): "* * * To sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not sustain the verdict."

■ The record contains no evidence of a conspiracy as charged, and the motion for a directed verdict should have been granted. The judgment is reversed and the cause remanded with directions to the district court to discharge the defendant.

Mr. Justice Burke and Mr. Justice Jackson dissent.