No. 15,321.

STARR v. THE PEOPLE
(157 P. [2d] 135)

Decided February 5, 1945.

Mr. L. E. LANGDON, Mr. JOHN T. BARBRICK, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

AN information containing two counts was filed in the district court of the City and County of Denver against William H. Timbel, A. C. Ackers and John F. Starr, members of the Colorado State Board of Barber Examiners, and Ruth Gross LaVielle (formerly Ruth Anna Gross), clerk-typist under state civil service and an employee of the board. The first count charged conspiracy to commit embezzlement; the second count charged embezzlement. Ackers, before the trial, pleaded guilty to both counts and testified as a people's witness in the joint trial of the three remaining defendants. The

jury returned a verdict of acquittal on both counts as to Timbel. It also acquitted both LaVielle and Starr of embezzlement, but found them both guilty of conspiracy to commit embezzlement. To reverse the judgment based on these verdicts, Starr and LaVielle have sued out separate writs of error here and have filed separate briefs which, however, are based on the one record from the trial court.

The State Board of Barber Examiners, created by '35 C.S.A., section 2, chapter 19, volume 2, consisting of three members, each appointed from a different category of barbers, is directed to elect a president and secretary-treasurer from its membership (section 3). Section 4 of the act provides: "Each member of the board shall receive as compensation for his services the sum of eight dollars ($8.00) per day in addition to his actual traveling expenses; provided that neither the said compensation nor the traveling expenses shall in any event be paid out of the treasury of the state of Colorado." The act further directs: "All fees, fines and penalties shall be collected by the board of barber examiners and paid to the state treasurer who shall receipt therefor, and shall be kept by the state treasurer in the state board of barber examiners fund for the uses and purposes of this chapter." §18.

From the foregoing provisions it is apparent that the members and employees of the board are to receive their compensation exclusively from the fund of the State Board of Barber Examiners, of which the state treasurer is the custodian. That fund consists of the fees, fines and penalties collected by the board.

That portion of the evidence which is not disputed, shows that during the period covered by the information (April 1939 to December 1940) Starr was president of the board, Ackers was secretary-treasurer, and LaVielle was clerk-typist doing the clerical work of the board; that Ackers was the active member in the office, he and LaVielle having access to the office safe; the

other two members spending more of their time on tours of inspection and examination over the state. During the period in question two procedures had become common practice: When an applicant for a license was unable to pay the full amount of the fees exacted, the officials of the board would (1) accept a partial payment, (2) issue a partial payment receipt, and (3) place the money in the board's safe, and thereafter neither turn it over to the state treasurer nor account for it in any way to that official up to the time of payment of final instalment, if any. This practice became especially common in the case of partial payments made by applicants for licenses to practice cosmetology, such applicants being required, in certain cases, in addition to a certificate of registration to practice cosmetology, to obtain from the state board of barber examiners a license to cut or trim hair. '35 C.S.A., c. 42, §1.

The second procedure was that of issuing official receipts for fully paid licenses which contained numbers that were fictitious. There was testimony that some of these numbers were just made up by the person issuing the receipts—sometimes a number was chosen purposely so that it would be the same as that on an already issued receipt. Thus, where two receipts had been issued bearing the same number, each representing the sum of ten dollars, the office would have collected twenty dollars but would turn over to the state treasurer only the first ten dollars collected and retain in the safe the ten dollars collected on the subsequent fictitiously numbered receipt without any accounting therefor.

It is undisputed that, out of the funds thus secretly retained and not accounted for, expenditures were made for the following purposes: (a) A trip made by all members of the board to Des Moines, Iowa, to attend a national barbers' convention at a time when the state executive council was restricting members of boards and bureaus from making out of state trips. All such trips made previously had been approved in advance

by the state executive council and vouchers therefor were regularly drawn against the state treasurer. (b) Donations to charity, for which the board members were given individual credit. (c) At least one Christmas present (and possibly more) to LaVielle. (d) A present to a member of the secretary of state's office who was the supervisor of the board. (e) For entertainment purposes. (f) For the purchase of supplies used by the board. (g) Pay for work performed on holidays, when the state house would be closed (these payments seem to have been made at the rate of ten dollars per day). (h) I O U's of LaVielle, and one I O U of Ackers for the use of Starr, all of which, however, were subsequently repaid.

In December, 1940, the terms of Ackers and Timbel as members of the board expired, and new appointees of the Governor succeeded them. Starr held over and his term finally terminated December, 1941. In the organization of the new board at the beginning of 1941, defendant Starr became secretary-treasurer, and it is admitted that he and LaVielle continued the two practices above outlined—relating to the withholding of funds received from (1) partial payment, and (2) issuance of fictitious licenses—which had been carried on by the former board. Defendant Starr's contention is that he was not familiar with those practices until he became secretary-treasurer of the new board in 1941, and that they were then continued only for the purpose of protecting Ackers and with the hope that eventually the deficit might be eliminated. There seems to have been no increase in the deficit during Starr's incumbency as secretary-treasurer, and the information and conviction pertain to the period prior thereto.

These two wholly unwarranted procedures of the board were discovered during an audit conducted by the state auditor's office in 1942—a discovery which culminated in the present proceedings against defendants. Such audit disclosed there was a total shortage of $4,465,

consisting of (1) $1,088 in the general funds of the board, (2) $3,020 in license fees for 302 hair cutters' licenses issued prior to December 7, 1940, and subsequent to April 10, 1937, and (3) $357 on account of partial payments received from applicants for licenses to trim hair to be issued in conformity with the provisions of the cosmetology act.

What we have said up to this point furnishes a background for the cases involving both Starr and La-Vielle. Henceforth our attention is directed solely to the case against Starr. His counsels' first assignment of error is, that the trial court erred, "In overruling the defendant's motion to quash the first count of the information." In support of this assignment he argues: "The count as drawn is duplicitous and sets out not only an allegation of conspiracy but includes therein the substantive offense." No authorities in point are cited to support counsels' proposition in his main brief, and we are of the opinion, from a reading of the pertinent count in the information, that it is grounded on the conspiracy charge. The fact that the count includes more than we held to be necessary in *Sweek v. People,* 85 Colo. 479, 277 Pac. 1, and in *Helser v. People,* 100 Colo. 371, 68 P. (2d) 543, to which counsel refer in their reply brief does not necessarily render the count insufficient. In those cases we were dealing with legal minimums, not maximums. We can not see how defendant could have been taken by surprise in not thinking he was being charged with a conspiracy in the first count, as well as the actual commission of the felony in the second count. We see no prejudice.

Defendant's second, third and fifth assignments are grouped under the argument that the funds collected by defendants, and used by them in the various ways heretofore described, were not public funds of the state; that therefore the information should have been quashed. Reliance is placed upon *Wright v. People,* 104 Colo. 335, 91 P. (2d) 499, and especially upon *United*

*States v. Mason,* 218 U.S. 517, cited therein. We do not believe those cases are controlling.

In *Wright v. People, supra,* we held that defendant, charged with embezzlement of public moneys as an officer or agent of the county, did not receive any county funds; that the proof showed that he actually received money of private individuals who were engaged in buying county warrants; that therefore the evidence did not support the charge set out in the indictment, and that a different offense was proven than that alleged.

In *United States v. Mason, supra,* it appeared that a clerk of a federal district court, indicted for embezzlement, was lawfully permitted under the then pertinent statute to take a certain amount as his salary out of the funds which came into his possession, the overplus to be accounted for to the United States. The court sustained a demurrer to the indictment, saying: "The fees and emoluments are not received by the clerk as moneys or property belonging to the United States, but as the amount allowed to him for his compensation and office expenses * * * and with respect to the amount payable when the return is made the clerk is not trustee but debtor."

In the instant case, however, our Colorado statute creates no such relationship of debtor or creditor. There is only one thing the board is authorized to do when it collects a fee, fine or penalty, and that is to turn the money over to the state treasurer, who must receipt for it and keep it in the special fund. There is also only one method by which members of the board and its employees can be paid for services and reimbursed for expenses, and that is by regular voucher issued by the state treasurer. In the Mason case the funds were lawfully retained in the hands of the clerk of the district court and he was bound simply to give a proper accounting therefor. In the instant case, the funds were unlawfully retained by the members of the board. In pass-

ing, it may also be suggested that in the Mason case the funds were retained by the clerk openly. In the instant case they were retained surreptitiously. The theory that defendant çould give an accounting and by so doing exonerate himself seems to have been adopted only after the secret fund, upon its being discovered by examiners making the state audit, had ceased to become secret.

 Defendant's fourth and sixth assignments of error are based on the theory that no conspiracy was proven against defendant; and that even if there was, it was the conspiracy between defendant and LaVielle, which began only after defendant became secretary-treasurer in December 1940, and not the conspiracy alleged. Counsel argue that *Norton v. People,* 110 Colo. 352, 135 P. (2d) 239, is controlling. In that case we held, that to sustain a verdict on an indictment charging conspiracy, the evidence must establish the conspiracy charged; that evidence showing another conspiracy will not suffice; that the record contained no evidence of a conspiracy as charged, and hence a directed verdict in favor of defendant should have been granted.

But in the instant case we are of the opinion there was evidence of the conspiracy as charged, which the trial court properly allowed to go to the jury. Nowhere is there anything that negatives defendant being a party to the scheme, and the record shows, as counsel themselves point out, that defendant knew of the existence of this fund and had received therefrom money to go to the Des Moines convention, pay for services rendered on the holidays upon which he had worked, credit for some charitable donations, and credit for a Christmas present to LaVielle. He also testified that he knew of the issuance of duplicate license numbers before December 1940, and that his own I O U was in the office safe. Mrs. La-Vielle (Miss Gross) testified that these practices were indulged in at the "request of the board."

 Counsel point out that defendant testified he had

no intention of embezzling, and that he believed he had a right to do what he did; that therefore that element of a crime was lacking. Whether there was criminal intent was a question for the jury. *Lewis v. People,* 99 Colo. 102, 60 P. (2d) 1089; Id. 109 Colo. 89, 123 P. (2d) 398.

The people also introduced evidence tending to show that defendant had benefitted from this secret fund considerably more than indicated by the foregoing items. This he denied, and, the evidence being conflicting, that question also was for the jury to resolve.

From what we have said in the foregoing paragraph, it is apparent that we believe that the tenth, eleventh, twelfth, and thirteenth assignments of error—grouped under the proposition that the jury verdict is contrary to the law and evidence—are not well taken.

The seventh, eighth and ninth assignments relate to errors in giving or refusal to give certain instructions. Counsel in their reply brief conclude that any prejudice that may arise from the failure of the trial court to give defendant's tendered instruction number two was cured by the giving of instruction number twenty. They insist, however, that instructions seventeen and eighteen tended to mislead the jury, and that these objectionable features are not remedied by instruction fifteen. We believe that the three instructions when read together are adequate in correctly setting forth the law in respect to conspiracy where the element of circumstantial evidence is present. *Smaldone v. People,* 103 Colo. 498, 88 P. (2d) 103.

The fourteenth assignment of error is based on the theory that the jury verdict, that defendant was not guilty of embezzlement under the second count, is inconsistent with its verdict of guilty of conspiracy to commit embezzlement under the first count. Counsel rely upon *Webb v. People,* 83 Colo. 1, 262 Pac. 906. We expressly overruled that case in *Crane v. People,* 91 Colo. 21, 11 P. (2d) 567, as a result of the case of *Dunn*

*v. United States,* 284 U.S. 390, 52 Sup. Ct. 189, 76 L. Ed. 356, which was decided subsequent to the Webb case and immediately prior to the Crane case. The Dunn case stands unreversed and the principle therein announced remains the rule in the federal courts. We see no reason for changing the rule in Colorado as announced in the Crane case. It is in harmony with *Davis v. People,* 22 Colo. 1, 43 Pac. 122, and *Short v. People,* 27 Colo. 175, 60 Pac. 350, and we have recently reaffirmed it in *Elstun v. People,* 104 Colo. 302, 91 P. (2d) 487.

Judgment affirmed.

MR. JUSTICE HILLIARD dissents.

MR. JUSTICE STONE and MR. JUSTICE ALTER, not having heard the oral arguments, do not participate.