No. 15,322.

LAVIELLE *v.* THE PEOPLE
(157 P. [2d] 621)

Decided February 5, 1945.

278

Mr. BYRON G. ROGERS, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

MR. JUSTICE KNOUS delivered the opinion of the court.

PLAINTIFF in error, to whom we shall refer hereinafter as the defendant, was convicted of conspiracy to embezzle public funds of the State of Colorado, under the same information and in the same jury trial as was John F. Starr, plaintiff in error in case No. 15321, wherein the judgment was affirmed, the opinion being reported in the present volume at page 268, under the title, Starr v. People. Both cases came here upon the same record, and, as has been stipulated by the parties and approved by us, the instant proceeding is considered upon the abstract of the record filed in the Starr case but with separate briefs.

Inter alia, defendant seeks reversal of the judgment of conviction against her upon the ground that the court erred in failing to sustain her motion for a directed verdict of not guilty based upon the insufficiency of the evidence to warrant a conviction of the offense charged. Since we are convinced that defendant's contentions on this point are valid, no necessity arises for the consideration of the other assignments of error advanced.

The general facts surrounding the transaction are well stated in the opinion in *Starr v. People, supra,* and, except for certain items of evidence peculiarly pertinent to the situation of this defendant, no further detailed recital thereof need be made herein.

The conduct which we have held in *Starr v. People, supra,* was cognizable as a conspiracy to embezzle the public funds of the state, unquestionably was induced by a change in the statutory law pertaining to the duties and operation of the State Board of Barber Examiners. Prior to the adoption of the legislative enactments cited in the Starr opinion, the barber board had functioned without a legislative appropriation and without incident controls on funds collected by it for barber licenses, examinations, etc. In this previous situation members of the board regularly had allowed themselves per diem pay for Sundays and holidays and from such fund also had made expenditures for their traveling expenses to conventions, for charitable donations and the purchase of supplies and equipment. With the advent of the reorganization bill and the attendant restrictions on disbursements, the last described practices of the board no longer could be pursued. To circumvent the new requirements, Ackers, then the secretary-treasurer of the board, and as such charged with the performance of executive functions including the collection and custody of license fees until their lodgment in the state treasury, commenced paying cash therefrom to himself and the other members of the board, with their tacit consent,

for per diem allowances in addition to those which legally were permissible and regularly voucherable against the appropriation therefor. In addition, from cash on hand the secretary-treasurer, with the knowledge and consent of at least some members of the board, paid in cash, expenses of trips, contributions and donations as detailed in the Starr opinion. In the beginning the practice was made feasible by the circumstance that in the interims between the making of deposits of collected fees with the state treasurer and because of the retention by the board of the proceeds of partial payments on license fees as described in the opinion in the Starr case, the secretary-treasurer of the board generally had substantial sums of cash on hand. The partial payment cash was kept in a separate drawer of the safe in the board's office and was not audited by the state, since theoretically a license and official receipt did not issue until the installments paid by a given applicant met the total fee due. In time, by the surreptitious cash withdrawals mentioned above, this drawer was emptied of cash. Thereafter, to make payments to board members and for the other purposes mentioned, the secretary-treasurer took cash from the regular license receipts which were kept, until deposit with the state treasurer, in another drawer in the safe. The items therein were subject to audit by the state. To avoid detection of abstractions of cash therefrom it thus became necessary to devise some scheme for concealing the shortages from the auditor. The contingency was met by the extension to *paid* licenses of the plan which the board traditionally had followed in the issuance of "complimentary" licenses. In the case of *paid* licenses, successively numbered official receipts regularly were issued from a book kept for that purpose and with licenses bearing numbers respectively corresponding with the receipts were delivered to the licensees. The stubs of this receipt book thus reflected accurately the amount of money received as well as the number of

licenses issued and was audited to check the receipts deposited with the state treasurer. In the case of so-called "complimentary licenses," which the board members, for reasons best known to them, issued to individuals of their choice, no fees were collected, hence no receipt was issued and the license was given a fictitious number. Thus, from an examination of the official receipt book, no auditor could determine or would suspect that licenses other than as shown therein had been issued. In the exigencies arising from the abstractions of cash we have mentioned, this practice was expanded to include "covering up" the receipt of fees for *paid* licenses. In operation, as occasion required, an official receipt for a fee paid was not made nor issued, but to lull the licensee a license bearing a number seized "out of the air" was sent to him. Thus, short of a check of the applications or of licenses outstanding in the hands of licensees, an audit of the books of the board would disclose no variance between the receipts and cash received and no shortage in the latter. Such were the procedures involved. The objective was to secure moneys, above those lawfully voucherable, for members of the barber's board by abstractions of cash from public moneys of the state in the hands of the board.

It is fundamental, that to convict one of the crime of conspiracy, at least three material elements must attend beyond a reasonable doubt. The first of these is that there must be a combination of two or more persons. The second essential is the existence of an unlawful purpose to be accomplished, which in Colorado must amount to a crime. *Olde v. People,* 112 Colo. 15, 145 P. (2d) 100. The third element is that, "there must be a real agreement, combination, or confederation with a common design; mere passive cognizance of the crime * * * to be committed or mere negative acquiescence is not sufficient." 11 Am. Jur., p. 544, §4.

Independent of any participation on the part of the defendant, the proof of the unlawful combination and

common objective of board member Starr, whose conviction of conspiracy has been sustained, and Ackers, who pled guilty to both the embezzlement and conspiracy counts of the joint information, meet the foregoing requirements and thus was sufficient to show the existence of a conspiracy to accomplish the unlawful purposes charged.

■■ The question for decision in the instant proceeding is whether, within the essential criteria specified, the evidence was sufficient to show that the defendant wilfully and with a guilty knowledge of its corrupt purpose, entered into the conspiracy. It is well established in law that the existence of the agreement or joint assent of the minds need not be proved directly, but may be inferred by the jury from the facts proved. Thus, if there was evidence adduced herein from which willful participation by defendant was established directly or might be inferred legitimately, the question of its resolution was one for the jury and the submission of the case to it was proper. In the dearth of such evidence, however, the court should have sustained defendant's motion for a directed verdict. In considering the question it is to be borne in mind that acts done innocently, although tending to further the object of a conspiracy, will not render the author a coconspirator. 15 C.J.S., p. 1072, §45. See, also, 11 Am. Jur., p. 547, §7.

■ Defendant, a clerk-typist under civil service, in 1931 was assigned to work for the barber board. Essentially, under civil service rules the duties of a clerk-typist are to take care of stenographic work and help with administration. Under civil service classification and regulations, a clerk-typist at all times is under the direction of the members of the board or the executive head thereof to which she is assigned and such employee's failure to so perform may be made the basis for a charge of insubordination before the commission. It would appear that defendant was the only civil service

employee assigned to the barber board. At the times here in question defendant's salary was $125.00 per month. This, and no more, was received by her under proper vouchers and warrants from the state treasurer. The people admit that, except for an occasional Christmas gift of ten dollars, hereinafter to be mentioned, defendant received no part of the funds unlawfully diverted by the board members. There is no doubt that in the course of her work the defendant regularly collected and receipted for partial payments on license fees and placed the money received therefor in the appropriate drawer in the board's safe, to which she had access, and did nothing more with respect thereto. The Attorney General denominates such habit of receiving partial payments on license fees as "a poor business arrangement," but concedes that "had the fund been honestly administered and fully accounted for, the practice, probably, could not have been made the basis of a criminal prosecution." No evidence connects defendant with any duty or act in connection with either the administration or disposition of these proceeds. Likewise, it is certain that defendant upon many occasions issued licenses with fictitious numbers, and without official receipts, and even at one time suggested as a simplification of the scheme the use of duplicate numbers of official receipts already issued in lieu of numbers conjured up at random, which procedure was adopted thereafter at the direction of Ackers. As a witness, defendant admitted that she knew the effect of this practice was to conceal receipts from the auditor unless "he looked into the files," which it seems was not done ordinarily. She further testified that for reasons unexplained to her the foregoing activities were performed by her under the direction of her superior, the secretary-treasurer acting for the board. Her testimony in this connection not only was not denied by anyone, but was directly corroborated by every witness for the people and defense, who testified upon the subject. That

the pattern of her conduct as an employee was one of conformance to the directions of her superiors, is supported by the circumstance that in the years of exemplary administration of the board before and after the conspiracy, she as punctiliously performed the tasks assigned her as in the dark days of the conspiratorial period. Of course, the fact that a person is acting as an employee of another constitutes no defense in a criminal prosecution where the individual charged intentionally violated the law. See, 2 Am. Jur., p. 267, §343. To give the principle application here the Attorney General, without citation of a folio reference, states in the answer brief: "It is an admitted fact" that defendant "knew of the unlawful disbursement" made from the funds in question. The accuracy of this statement is challenged by counsel for defendant in the reply brief. Our examination of the record has failed to disclose that such an admission was made by defendant in the trial or attributed to her by any witness. It is possible that the Attorney General's misapprehension in this connection arose from the following statements in the narrative form of the abstract of the testimony of Auditor Breen (folio 114): "Mrs. LaVielle outlined the scheme that was being used by the Barber's Examiner Board. She said she knew." However, reference to the record shows unmistakably that this testimony related to the mechanics of the duplicate numbering system for the issuance of licenses and not to the abstraction of cash from the fund or shortages therein. The statement of the same witness appearing at folio 118, narrated in the abstract as: "Mrs. LaVielle told me how it was carried on," pertains solely to the questioned accounting procedure of the board. An examination of the record also discloses with certainty that the statement of people's witness, Ackers, folio 144, abstracted as being "All members of the board, including Mrs. LaVielle, knew what was going on," was directed to the legitimate routine business of the board and not to the illegal

activities of some of its members. Rather, as we understand the evidence, no witness testified that defendant had observed, been informed or knew that the secretary-treasurer was distributing cash from the safe to board members or was making donations and paying board expenses therewith. It appears affirmatively from the evidence that these distributions were made privately and informally without official record thereof and, hence, it may not be inferred properly that defendant gained knowledge thereof, either because of the mere fact of her presence in the office or from her infrequent attendance at meetings of the board or in typing the minutes of its legitimate activities. Noticing the absence of proof of her knowledge of the embezzlement, as appears, the participation of defendant in the irregular accounting procedures ordered by the secretary-treasurer to hide his abstractions, cannot be said to be inconsistent with defendant's innocence of the charge of conspiracy as laid.

■ As has been mentioned, upon one or more occasions the defendant was handed ten dollars in cash by the secretary-treasurer, as a Christmas gift from the board. Ackers testified that he took the money from the partial payment cash drawer, but there was no evidence whatsoever to show that defendant knew that such was its origin. The same witness also stated that from this identical source a Christmas gift had been given to the supervisor of the board in the state treasurer's office and donations had been made to the United Health Appeal and to the Community Chest. In these circumstances, as we view, it would be no more proper to brand the defendant as a coconspirator because she accepted these modest gifts than it would be to place the latter recipients of the supposed bounties of the board in such category, which, of course, would be unthinkable.

In the reception of evidence pertaining to the offenses charged, it developed incidentally that upon occasion

286

the defendant, as seems to have been the general practice of certain members of the board, made temporary withdrawals of cash for her personal use from the regular receipts drawer in the safe of the board, substituting therefor her I.O.U.'s. At times the aggregate total of these I.O.U.'s amounted to a considerable sum. All of these withdrawals were repaid in course and no fund suffered loss in consequence. No attempt at concealment was made in this connection and these I.O.U.'s were regularly accepted and passed by state auditors as cash on hand. Obviously this incident has no connection with the conspiracy charged or the alleged participation of defendant therein, and properly the Attorney General makes no reference thereto in his answer brief, but we mention the subject as a possible explanation of the verdict of the jury for which we cannot account otherwise.

Considering, as has been said, that the objective of the conspiracy charged was embezzlement of state funds, we are satisfied, for the reasons stated above, that the evidence adduced was insufficient to establish that defendant was a party to such conspiracy or that she wilfully did any act in furtherance of the common design of the real conspirators.

The judgment is reversed.

Mr. Justice Burke and Mr. Justice Jackson dissent.

Mr. Justice Stone and Mr. Justice Alter, not having heard the oral argument, do not participate.