## No. 23871.

E. D. DRESSEL *v*. THE PEOPLE OF THE STATE OF COLORADO.
(483 P.2d 367)

Decided April 12, 1971.

Sandhouse & Sandhouse, Charles H. Sandhouse, for plaintiff in error.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, George P. DeRoos, Assistant, Richard McManus, Assistant, for defendant in error.

*In Department.*

Opinion by Albert J. Tomsic, District Judge.*

Plaintiff in error, E. D. Dressel, hereinafter referred to as the defendant, was charged in an information filed by a special prosecutor with conspiracy with one Larry Morgan, and some person, or persons, unknown, between October 2, 1966 and May 15, 1967, the exact dates being unknown, to commit the crime of embezzlement by warehouseman of the personal property of one Wayne Duncan, as that crime is defined by C.R.S. 1963, 40-5-18.

The jury rendered a verdict of guilty, and defendant was sentenced to a term of five to eight years. By writ of error, the defendant seeks reversal of the judgment and sentence imposed.

At the conclusion of the People's case, the defendant moved for a judgment of acquittal on the ground of insufficiency of the evidence to establish the necessary elements of the conspiracy as charged, which was denied. Defendant elected to stand on his motion for judgment of acquittal and presented no testimony in his own behalf.

Defendant asserts several errors in relation to his conviction, the principal specification being that the motion

---

*District Judge sitting under assignment by the Chief Justice under provisions of article VI, section 5(3) of the constitution of Colorado.

for judgment of acquittal should have been granted.

The principal witness for the People was the alleged co-conspirator, Larry Morgan.

The evidence disclosed that the Farmer's Elevator Company of Sterling, Colorado, hereinafter referred to as the Elevator Company, was in the business of storing grain in its elevators for third parties and buying and selling of grain. The officers and directors of the Elevator Company, a corporation, were Raymond Swedlund, president, who was also executive vice-president of The First National Bank of Fleming, Colorado, Sherman Walrod, vice-president, who was also the district attorney, and Mrs. Velma Swedlund, secretary-treasurer.

Larry Morgan testified that he had been employed by the Elevator Company in July 1962, and was made manager in April 1964. His duties included the merchandising of, and buying and selling grain, supervision of loading and unloading of trucks and supervision of recordkeeping. Raymond Swedlund was his immediate supervisor. Morgan testified that in May 1966, he reported to the officers and directors of the Elevator Company that there was a shortage of grain in the elevator and admitted that this situation continued until the elevator closed May 15, 1967. He also testified that the Elevator Company had been overdrawn in its checking acount in The First National Bank of Fleming, or had short checks outstanding as follows: July 1966 — $120,495.81, October 2, 1966 — $14,049.91, December 1, 1966 — $29,357.56, and April 3, 1967 — $25,666.59; and that the financial situation was within the knowledge of the officers and directors of the Elevator Company.

He further testified that between July 21, 1966, and October 2, 1966, the Elevator Company had sold 128,935 bushels of grain; that the last physical inventory of grain in the elevators taken was January 6, 1967, at which time there was a shortage of 22,394 bushels of grain in the elevator.

Wayne Duncan, whose grain was allegedly embezzled

from the elevator, testified that he had been doing business with the Elevator Company, and had delivered grain for storage during July and August of 1966 (however, the record does not disclose the quantity of grain delivered during these months); that his last delivery was October 3rd or 4th, 1966, in the amount of 508 bushels. He further testified that 2400 bushels were sold by Morgan in December of 1966 for $1.57 a bushel, for which he received the money.

There was introduced into evidence a warehouse receipt issued to Duncan by Morgan, dated January 6, 1967, for wheat received by the Elevator Company in the amount of 3,674.32 bushels, which Morgan and Duncan contended represented the balance of Duncan's wheat held by the Elevator Company.

Morgan further testified that Duncan's grain was sold by him during the period it came in until the elevator closed, to cover short checks in the elevator accounts, and that the Elevator Company had neither grain nor money to give to Duncan when the elevator closed.

In relation to the defendant's connection with the Elevator Company, Morgan testified that The First National Bank of Fleming had repossessed two trucks and that an agreement was entered into between the Elevator Company and the defendant, part of which agreement was that the Elevator Company would furnish checks to buy grain "sort of as a financial backing, and the grain would be sold, and the proceeds thereafter returned to the elevator"; that the defendant began operating the trucks in the first week of December, 1966; that defendant had no prior connection with the Elevator Company except that they had leased some trucks from him prior to that time; that signed checks for the purchase of grain were furnished to defendant, or his drivers, in most instances without designation of payee or amount; that the checks in all cases were issued to various grain companies in North Dakota, South Dakota, Kansas, Nebraska; that they did not receive any of the grain, nor all of the

money from the sale of such proceeds; that he sold a considerable amount of the stored grain in the elevator to cover the checking account; and that he made requests of defendant to do something about the situation but that he never got any satisfaction — just excuses from defendant.

With respect to the trucking operations of defendant for the Elevator Company after December 1, 1966, Morgan testified as follows:

"Q. Was there any of the operations where any grain had been loaded on the trucks that were referred to as the 'Dressel Trucks' and taken somewhere else for sale?

"A. No.

"Q. So that it would be a one-way situation of grain coming into the Farmers Elevator Company and being left there from the Dressel trucks, is that correct?

"A. Well, there is just a couple of loads that they brought in there.

"Q. But none was loaded on the Dressel trucks and was taken somewhere else?

"A. Oh, if it was, it was when we might have had something coming in from Nebraska with a legal load and something they dumped previously might have been loaded on top to comply with Colorado State weight laws, something like that. It was no big operation."

Although Morgan testified as to the issuance of the Elevator Company checks to various grain companies, the only check presented and admitted into evidence was a draft for the sum of $3,800 made payable to one Paul Ervin, who testified that on October 18, 1966, the defendant, Larry Morgan, and one Al Hurley, approached him and wanted to know if he would cash a check for them; and that the four of them went to the Security State Bank and he cashed the draft and gave the $3,800 in cash to "them," specifically, "Mr. Dressel, Larry Morgan and Al Hurley."

Further testimony was developed regarding dealings by Morgan on behalf of the Elevator Company, Swedlund

and the defendant in grain futures, and that they lost money on the transactions.

With respect to sales of stored grain, Morgan testified as follows:

"Q. Now, Mr. Morgan, in regard to the sale of the stored grain, you admitted that you sold this, is this correct?

"A. Yes, sir.

"Q. You admitted that you sold the grain of Wayne Duncan, is that correct?

"A. Yes, sir.

"Q. Did Mr. Swedlund at any time advise or encourage you to make any sale of this stored grain?

"A. Yes, sir.

"Q. And did the defendant, Mr. E. D. Dressel, ever advise you or ask you or encourage you to do the same thing as Mr. Swedlund?

"A. Yes, sir.

"Q. And did this advice and encouragement happen in 1966 and 1967?

"A. Yes, sir.

"Q. Was it your intention that this would be paid back?

"A. That's what I was told by the defendant, yes."

Under the evidence, defendant's motion for judgment of acquittal should have been sustained. The elements necessary to constitute the crime of conspiracy in Colorado as recited by this Court in *LaVielle v. People,* 113 Colo. 277, 157 P.2d 621, are the following:

"* * * The first of these is that there must be a combination of two or more persons. The second essential is the existence of an unlawful purpose to be accomplished, which in Colorado must amount to a crime. *Olde v. People,* 112 Colo. 15, 145 P.2d 100. The third element is that 'there must be a real agreement, combination, or confederation with a common design; mere passive cognizance of the crime * * * to be committed or mere negative acquiescence is not sufficient.' 11 Am. Jur., § 4."

The evidence in this case fails to establish the necessary elements required for conviction. Taking the People's

evidence in the best possible light, there was some evidence of embezzlement or theft by defendant of grain purchased by defendant for the Elevator Company with blank checks furnished by Morgan (there being no evidence that defendant cashed any of the checks used to purchase grain, or that the grain companies to whom the checks were ultimately issued did not receive the money). There was also some evidence that defendant, Larry Morgan and one Al Hurley conspired with the witness, Paul Ervin, to cash a grain draft fraudulently issued to Paul Ervin in the sum of $3,800. However, defendant was not charged with any of these offenses. The sole charge upon which defendant was tried and convicted was that of conspiring with Larry Morgan, or some person or persons unknown, to embezzle the grain of Wayne Duncan stored in the Elevator Company's warehouse.

■ To sustain a verdict on an information charging one particular conspiracy, the evidence must establish the conspiracy charged; evidence that establishes another conspiracy or several other conspiracies will not sustain a verdict. *Ziatz v. People,* 171 Colo. 58, 465 P.2d 406; *Norton v. People,* 110 Colo. 352, 135 P.2d 239.

The evidence established that the grain delivered to the elevator by Duncan in July, August and October, 1966, had been sold between its first delivery in July 1966, and the time the elevator closed in May 1967; that defendant's connection with Morgan and the Elevator Company in grain dealings did not begin until December 1966; that the last physical inventory of grain in the elevator on January 6, 1967, disclosed a shortage of 22,394 bushels of grain; that the Elevator Company had been operating in a shaky financial condition prior to July 1966. Furthermore, there was no testimony that defendant received any grain from the elevator, or any money from the sales of grain stored in the elevator.

■ Taking into consideration these facts and the evidence in general relating to the alleged conspiracy, in our view, the evidence was not sufficient to establish,

either directly or by legitimate inference, a real agreement, combination or confederation between defendant and Morgan, with the common purpose of embezzling the grain of Duncan stored in the elevator, as charged, and in the dearth of such evidence, the question was not one for the jury's determination. *LaVielle v. People, supra.*

Accordingly, judgment of conviction is reversed and the cause remanded with directions that the defendant's sentence be vacated and the information be dismissed.

MR. JUSTICE HODGES, MR. JUSTICE GROVES and DISTRICT JUDGE JACK F. SEAVY* concur.

_____
*District Judge sitting under assignment by the Chief Justice under provisions of article VI, section 5(3) of the constitution of Colorado.